```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

ERICA SELSHTUT,                   )
                                  )
               Plaintiff,         )
                                  )
      v.                          )      No.  11 C 1312
                                  )
NORTHWEST HOME CARE, INC.,        )
et al.,                           )
                                  )
               Defendants.        )
```

<u>MEMORANDUM OPINION AND ORDER</u>

Erica Selshtut ("Selshtut") has sued her former employers,
defendants Northwest Home Care, Inc. ("Northwest") and Aris Home
Health, Inc. ("Aris"), under the Family Medical Leave Act
("FMLA," 29 U.S.C. §§2601 to 2654),[1] asserting that they failed
to reinstate her upon her request to return from FMLA leave.
Selshtut has moved for partial summary judgment under Fed. R.
Civ. P. ("Rule") 56, and the parties have proceeded in accordance
with this District Court's LR 56.1.[2]  For the reasons stated
here, the Rule 56 motion is denied in its entirety.

_____

[1]  Citations to FMLA provisions will take the form
"Section--," without reference to Title 29.

[2]  LR 56.1 requires parties to submit evidentiary statements
and responses to such statements to highlight which facts are
disputed and which facts are agreed upon.  This opinion cites to
Selshtut's LR 56.1 statement as "S. St. ¶--," to defendants' LR
56.1 statement as "D. St. ¶--" and to the parties' responses as
"S. Resp. ¶--" and "D. Resp. ¶--," respectively.  Where the
response does not provide a version of the facts different from
the original statement, this opinion cites only that original
statement.  Citations to Selshtut's and defendants' memoranda
take the forms "S. Mem. --" and "D. Mem. --" respectively, and
citations to Selshtut's reply memorandum take the form "S. R.
Mem. --."

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).[3] For that purpose courts consider the entire evidentiary record and must view all of the evidence and draw all inferences from that evidence in the light most favorable to nonmovants (<u>Egan Marine Corp. v. Great Am. Ins. Co. of N.Y.</u>, 665 F.3d 800, 811 (7th Cir. 2011)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (<u>Carmichael v. Vill. of Palatine, Ill.</u>, 605 F.3d 451, 460 (7th Cir. 2010), quoting <u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th Cir. 2008)). As <u>Payne v. Pauley</u>, 337 F.3d 767, 772-73 (7th Cir. 2003) has explained:

> [T]he Federal Rules of Civil Procedure require the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Conclusory allegations, unsupported by specific facts, will not suffice.[4]

---

[3] At the summary judgment stage, of course, nonmovants Northwest and Aris need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion's later employment of the quoted terms is due to the cited cases' use of that terminology, but this Court imposes on defendants the lesser burden described earlier in this footnote.

[4] [Footnote by this Court] Lawyers (and, regrettably, judges) often lump "self-serving affidavits" into the category of submissions that are insufficient to overcome summary judgment. That blanket assertion is incorrect. <u>Payne</u>, 337 F.3d at 773 was

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). What follows is a summary of the relevant facts, viewed of course in the light most favorable to nonmovants Northwest and Aris.

### Factual Background

Northwest provides home health care services in Illinois through direct service employees ("Service Employees"), and it employed 50 or more people at all times relevant to the Complaint (S. St. ¶¶4, 6). Northwest is required to maintain documentation supporting each hour of service provided under the terms of its provider service agreement with the Illinois Department of Aging and Division of Rehabilitation Services of the Illinois Department of Human Services (D. St. ¶52). To qualify for reimbursement from either department, each timesheet must be signed by the Northwest client, must correctly state the number of hours and time of service, must be free from unauthorized

---

careful to distinguish conclusory affidavits from merely self-serving ones:

> We hope this discussion lays to rest the misconception that evidence presented in a "self-serving" affidavit is never sufficient to thwart a summary judgment motion. Provided that the evidence meets the usual requirements for evidence presented on summary judgment--including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial--a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.

alterations and must be signed by a supervisor verifying the accuracy of the timesheet (id. ¶53).

Elena Rom ("Rom") was Northwest's owner, corporate secretary and agency administrator at all relevant times and was responsible for hiring, firing and determining the salaries for all Northwest employees (S. St. ¶7). On June 23, 2009 Rom hired Selshtut as a receptionist and administrative assistant for Northwest and promoted her to the position of Home Care Supervisor approximately three months later (id. ¶¶8-9). Selshtut's duties as Home Care Supervisor included these things among others: monitoring the provision of client services, preparing service calendars and schedules for Service Employees, answering client questions, supervising and evaluating the performance of Service Employees, monitoring billing documentation such as employee timesheets, conducting in-home client visits, assisting in the hiring of new Service Employees and preparing monthly reports on active clients (id. ¶10).

Aris was formed in January 2010,[5] and it began performing all of Northwest's scheduling, compliance monitoring and data management services in March (S. St. ¶¶3, 15; D. St. ¶55). Rom is an owner of Aris and is responsible for hiring, firing and determining salary amounts for all Aris employees (S. St. ¶11). Aris and Northwest share the same office and have centralized

_____

[5] All dates mentioned hereafter without a year designation also refer to occurrences in 2010.

4

business operations and labor relations (id. ¶¶12-13). In March Rom informed Selshtut and Northwest's other non-Service Employees (collectively the "Office Staff") that all Office Staff personnel would in the future be paid by Aris (id. ¶17). Thereafter the Office Staff continued to manage and control Northwest's operations (id. ¶18).

On March 3 Selshtut was promoted to Head Home Care Supervisor (S. St ¶19). She continued to perform all her former duties but also took on management obligations (id. ¶¶20-21). To minimize the risk of data entry errors on time sheets, the Office Staff was responsible for comparing data entered in compliance reports with that entered in an electronic database (D. St. ¶60). If the data did not match, one of Selshtut's duties as Head Home Care Supervisor was to locate and eliminate any errors by manually comparing the data entered in the compliance reports and database with the original timesheets (id. ¶61).

On March 21 Selshtut received five peer reviews, two of which contained negative comments about her inappropriate language and dress, the level of her time management skills and her failure to adhere to documentation policies concerning timesheets, among other things (D. St. Ex. 3 to Ex. 1). Rom discussed the peer reviews with Selshtut the same day (D. St. ¶66). In July Selshtut informed Rom that she was pregnant (S. St. ¶22). Rom personally approved Selshtut's plan to take FMLA leave after the birth and never voiced any dissatisfaction with

Selshtut's plan (D. St. ¶83). FMLA leaves are routinely granted
to Aris's employees, the absolute majority of whom are female
(id. ¶84).

On August 20 Selshtut became Aris' State Coordinator[6] and
Cheryl Aguirre ("Aguirre") took over as Head Home Care Supervisor
(D. St. ¶71). On September 8 Olena Izotova ("Izotova"), who
worked in Northwest's payroll department, informed Rom that
Selshtut had been changing the data in the electronic database to
match the compliance reports without consulting the original
timesheets -- contrary to Defendants' policies and Rom's explicit
instructions -- and that Selshtut lied about doing so when
confronted (D. St. Ex. 3 ¶¶37-44). As a result Rom issued a
written warning to Selshtut and asked her to submit a written
explanation of her conduct (id. Ex. 5 to Ex. 1; D. St. ¶74).
Selshtut signed the written warning and dated her signature
September 10 (D. St. Ex. 5 to Ex. 1).

---

[6] Whether this constituted a demotion or a lateral move is
contested, as is the reason for the change in position.
According to defendants Rom met with Selshtut regarding her poor
performance and timekeeping inconsistencies multiple times
between March 21 and August 20 and ultimately demoted Selshtut to
State Coordinator, a non-management position, due to continued
complaints of data inconsistencies (D. St. ¶¶67-71). Selshtut
denies that any such meetings with Rom took place during that
time frame and asserts that becoming State Coordinator was not a
demotion and did not result in a decrease in pay (S. Resp. ¶¶67-
71). Instead she states that Aguirre took over as Head Home Care
Supervisor because Selshtut would be taking FMLA leave a few
weeks later and it was necessary for another employee to take
over her job functions at that time (id. ¶71).

Defendants and Selshtut disagree about what happened next. According to defendants, Rom presented the written warning to Selshtut on September 8 and required that she bring the written explanation of her misconduct to work on September 9 (D. St. ¶74). When Selshtut appeared at work without the explanation the next day, defendants claim that Rom terminated her for failure to comply with internal record management procedures and to provide an explanation of her misconduct as requested (id. ¶¶75-76). Selshtut admits that she received the written warning concerning her failure to reconcile the timesheets properly and that she failed to bring a written explanation of her misconduct on September 9, but she denies that Rom fired her at that time (S. Resp. ¶¶74, 76, 80). Instead she claims that Rom terminated her employment on October 1 (S. St. ¶30).

It is undisputed that Selshtut went into labor on September 12 and gave birth on September 13 (S. St. ¶¶25-26). She exchanged friendly texts with Rom announcing the birth later that day -- just four days after defendants claim that Rom fired her (id. ¶¶27-29). On October 1 Selshtut met with Aris and Northwest managers and asked to resume her employment (D. St. ¶80), providing Rom with a written explanation of her misconduct dated September 10 (id.; D. St. Ex. 7 to Ex. 1). Rom refused to reinstate Selshtut during the October 1 meeting (D. St. ¶81).

On October 22 Izotova left Selshtut a voicemail acknowledging that Selshtut had filed for unemployment benefits

and indicated an effective date of October 17 (S. St. ¶31).
Izotova also said Rom had informed her that "we can't return you
back to this office and the next office is unknown when we will
be renting [sic]; there is no set date as of now. That's why
regarding your employment it is not understood what is going on"
(id.). On October 27 Selshtut texted Rom to ask when should
would be returning to work, and Rom responded that "[t]here are
[sic] no approximate date[;] mutual management decision has not
been made" (id. ¶32).

Selshtut retained legal counsel, who sent defendants a
January 7, 2011 letter stating that they were liable for FMLA
violations in connection with their refusal to reinstate Selshtut
after the birth of her child (S. St. ¶36). In response
defendants' then attorney Eugene Klein ("Klein") sent a letter on
January 12 (the "January 12 Letter, S. St. Ex. 3") stating:

> In October of 2010 [Selshtut] was informed by Aris
> management that there is no sufficient work available
> for her

Klein further noted that Selshtut stated "lack of work" as her
reason for applying for unemployment benefits and that Aris did
not object (id.). Nowhere in the letter does Klein mention that
Selshtut was terminated for cause (id.). Defendants have
acknowledged that nothing in the January 12 letter is incorrect
and have not claimed that it was sent without their authorization
(S. St. ¶¶40-41).

At no time since the birth has Selshtut been employed by defendants or received insurance benefits from them (S. St. ¶¶33-34). During Selshtut's employment with defendants she worked full time (id. ¶45). She performed more than 1,250 hours of service in the 12 month period before September 2010 (id. ¶46). Aris, like Northwest, is an employer for FMLA purposes (id. ¶47).

**Klein's Letter Does Not Compel Summary Judgment**

Burnett v. LFW Inc., 472 F.3d 471, 477 (7th Cir. 2006)(citation omitted) teaches:

> To prevail on an FMLA interference claim, an employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required. Accordingly, the employee must establish that: (1) [s]he was eligible for FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [s]he was entitled to leave under FMLA, (4) [s]he provided sufficient notice of intent to take leave, and (5) [her] employer denied her FMLA benefits to which [s]he was entitled.[7]

Under Section 2612 an employee on FMLA leave has the right to be restored to the same position that she had before she took leave or to an equivalent position.

But that reinstatement right is not absolute, for if an employee would have been fired or laid off regardless of whether she took leave, she is not entitled to return to her former

---

[7] [Footnote by this Court] Defendants do not contest that Selshtut was eligible for the FMLA's protections and was entitled to take FMLA leave until September 9, 2010, nor do they contest that Aris was an employer under the FMLA or that Selshtut provided sufficient notice of her intent to take leave. Accordingly this opinion will say nothing further about those elements of Selshtut's claim.

position under the FMLA (<u>Goelzer v. Sheboygan County, Wis.</u>, 604 F.3d 987, 993 (7th Cir. 2010); 29 C.F.R. §825.216(a)(1)).[8] Likewise, an employee who has been fired for cause <u>before</u> a scheduled or anticipated FMLA leave is not entitled to reinstatement, even if the decision-maker was mistaken about the employee's culpability (<u>Buie v. Quad/Graphics, Inc.</u>, 366 F.3d 496, 505 (7th Cir. 2004)).  All that matters is that the employer honestly believed that there was legitimate, non-discriminatory cause to fire the employee (<u>id</u>.).

Where an employee claims that her employer denied her FMLA benefits to which she was entitled, she must establish that entitlement by a preponderance of the evidence (<u>Diaz v. Fort Wayne Foundry Corp.</u>, 131 F.3d 711, 713 (7th Cir. 1997)).  That done, her employer may then present evidence to show she would not be entitled to her position even if she had not taken leave or planned to do so (<u>Kohls v. Beverly Enters. Wis., Inc.</u>, 259 F.3d 799, 804 (7th Cir. 2001)).  Because the employee carries the burden of demonstrating her right to FMLA benefits, she must then overcome her employer's assertion (<u>id</u>.).  Here Selshtut must show that Aris would not have terminated her but for her planned FMLA leave.

Although the pleadings here demonstrate intense disagreement about whether Selshtut was fired for misconduct days before her

_____

[8] Further citations to the regulations will take the form "Reg.," omitting the prefatory 29 C.F.R. reference.

scheduled FMLA leave, Selshtut argues that the January 12 Letter constitutes a binding judicial admission that she was terminated during her FMLA leave for lack of work and not beforehand for misconduct (S. R. Mem. 2). As a special type of admission with special consequences, "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them" (Keller v. United States, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995)). And the requirement is stringent: "in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous" (Robinson v. McNeil Consumer Healthcare, 615 F.3d 861, 872 (7th Cir. 2010) (internal quotation marks omitted)), because "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible" (Soo Line R.R. Co. v. St. Louis S.W. Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997)).

Even if the January 12 Letter were considered a judicial admission -- an issue that this opinion does not reach -- that would not save Selshtut's motion for two reasons. First, Klein did not state that Selshtut was terminated because of lack of work, nor did he state that she was terminated in October. Instead he said in that month that defendants informed Selshtut that there was then "no sufficient work available for her" (S. St. Ex. 3). While defendants have explicitly confirmed the truth of that statement in their response to the motion, the fact

11

that Selshtut was so informed may well be consistent with defendants' version of the facts -- that is, Selshtut was fired for cause on September 9 and requested reinstatement on October 1, at which time Rom refused to rehire her. Similarly, the fact that Aris did not object to Selshtut's claim for unemployment benefits as set forth in the January 12 Letter does not amount to an admission that she was let go for lack of work.

Second, even if the January 12 Letter had explicitly stated (as it did not) that Selshtut was discharged in October due to insufficient work, laying off an employee during the course of her FMLA leave is not prohibited. Reg. § 825.216(a)(1) explains that "[i]f an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off." Selshtut would need to demonstrate that the layoff was pretextual and actually occurred not because of a lack of work but because she took FMLA leave. That she has failed to do.[9]

---

[9] Selshtut claims that defendants advertised to fill her position in December (S. St. ¶44), creating an inference that the statement as to insufficient work in October was pretextual. But that advertisement was not for her job, but rather for the position of "Homecare Case Supervisor" (id. Ex. 8), a post that Selshtut had not held for more than six months before she allegedly took FMLA leave (id. ¶19). For defendants to seek to fill a position that Selshtut had held at some other point in her employment with them does not demonstrate that laying her off -- if that is indeed what happened -- was pretextual. Moreover,

**Conclusion**

Because critical facts are contested and the January 12 Letter cannot preclude defendants' factual disputes, this opinion concludes that genuine issues of material fact remain and this case must proceed to trial. Hence a status hearing is set for 8:45 a.m. April 11, 2012 to discuss further proceedings in the case.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 5, 2012

---

defendants state that they never attempted to hire another State Coordinator, which had been Selshtut's position as of September 9 (D. Resp. ¶44, Ex. 1 ¶83).